**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 26-4303**

In re: Application of the United States of America for an Order Pursuant to 18 U.S.C. Section 2703(d).

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Elizabeth W. Hanes, District Judge. (4:25−dm−00001−EWH−DEM−1)

Argued: September 15, 2026 Decided: November 10, 2026

Before WILKINSON, WYNN, and BERNER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Wynn and Judge Berner joined.

**ARGUED:** Ari Benjamin Asher Holtzblatt, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant. Joshua Thomas Ferrentino, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Leah Fugere, Los Angeles, California, Aaron Zebley, Siddharth Velamoor, Hilary Hurd, Matt Morris, Andrew Nell, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant. Todd W. Blanche, Acting Attorney General, John A. Eisenberg, Assistant Attorney General, National Security Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Theophani K. Stamos, First Assistant United States Attorney, Alexandria, Virginia Brian J. Samuels, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee. Gabriel Rottman, Lisa Zycherman, Marietta Catsambas, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Washington, D.C., for Amicus Reporters Committee for Freedom of the Press. Eden B. Heilman, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia; Nathan Freed Wessler, Laura Moraff, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amici American Civil Liberties Union and American Civil Liberties

Union of Virginia. J. Jonathan Hawk, MCDERMOTT WILL & SCHULTE LLP, Los Angeles, California; Jacob Sommer, ZWILLGEN PLLC, Washington, D.C., for Amicus Apple, Inc. Todd M. Hinnen, John R. Tyler, Seattle, Washington, Addison W. Bennett, ASHURST PERKINS COIE US LLP, Phoenix, Arizona, for Amici Amazon.com, Inc.; Google LLC; and Meta Platforms, Inc.

WILKINSON, Circuit Judge:

It is part of the audacity of the American project to believe that collective security can coexist with individual freedom. In striking that balance, an intermediate appellate body can do no more than follow the instructions laid down by Congress and the constitutional wisdom imparted by the Founders and our nation's highest court.

The case before us began with a leak of highly sensitive information related to our national security. In its understandably vigorous investigation of that leak, the government sought two court orders pursuant to the Stored Communications Act ("SCA"). 18 U.S.C. §§ 2701-2713. Those orders (denominated the "Disclosure Order" and the "Secrecy Order," respectively) obligated appellant LinkedIn to produce the records of many journalists and prohibited it from divulging the existence of the orders to anyone. The requested records seemingly identify a vast number of confidential sources who have no conceivable relationship to the matter under investigation. While we respect the government's interest in gathering information potentially relevant to the leak, neither the Stored Communications Act nor the Constitution permit the district court to approve orders that by all apparent indications are substantially overbroad.

We remand the case to the district court to draw those orders more narrowly. That court was right to accord the government considerable latitude in pursuing and maintaining the integrity of its investigation. Even so, that latitude is not infinite. It is not appropriate for district courts to approve requests purely because the records requested are logistically feasible to compile. We reject LinkedIn's request to quash the orders entirely. That goes

much too far. We do agree, however, that the orders must be narrowed to conform with constitutional and statutory norms.

I.

A.

In recognition of the national security concerns implicated by this case, this opinion must, by necessity, speak generally and omit extraneous detail. The investigation underlying this case arose when a news organization (the "News Outlet") published an article "purporting to describe a top-secret United States military operation in a foreign country" (the "Article"). Response Br. at 8. The Article revealed classified information never previously reported. The LinkedIn profiles of the affiliated journalists (the "targeted journalists") identify their association with the News Outlet.

LinkedIn is a social media site marketed toward professionals with over one billion members worldwide. Its users create profiles indicating their profession, education, and affiliations. Users may send each other requests to "connect" or converse using the platform's private messaging feature. Both actions create metadata that record the sender, recipient, date, and time.

Social media is as ubiquitous in newsgathering as it is in other aspects of modern-day life. Ninety-four percent of journalists use social media for their jobs. Mark Jurkowitz & Jeffrey Gottifried, *Twitter is the Go-To Social Media Site for U.S. Journalists, But Not for the Public*, Pew Research Center (June 27, 2022), https://perma.cc/46Y5-P6KL. More than one in six use LinkedIn the most or second most. *Id.* Among nationally or internationally focused news organizations, that number jumps to one in four. *Id.* LinkedIn,

in turn, markets itself to journalists through a specially created program, "LinkedIn for Journalists." *LinkedIn for Journalists*, LinkedIn Pressroom, https://perma.cc/92KX-Q268.

In addition to standard professional networking, LinkedIn provides journalists with tools to locate potential sources. Journalists may, for example, search for LinkedIn users with particular employers or educational affiliations. LinkedIn then enables private conversations between journalists and sources through its messaging feature. Many journalists (including most of those relevant here) list their LinkedIn profiles among their public contact information, inviting potential sources to reach out via LinkedIn. Through the aid of LinkedIn, a journalist and source can therefore find each other and exchange extensive information without ever establishing any publicly visible connection. Without the ability to communicate privately that LinkedIn offers, that would be impossible.

B.

As part of a leak investigation related to the Article, the government learned that some of the targeted journalists may have communicated with confidential sources via LinkedIn. Accordingly, the government served LinkedIn with two court orders obtained pursuant to the Stored Communications Act. The first order (the "Disclosure Order"), under 18 U.S.C. § 2703(d), ordered LinkedIn to assemble and divulge the targeted journalists' metadata records from an eighteen-month period. During that time, the targeted journalists collectively published nearly 1,000 different articles on a variety of topics, less than five percent of which appear to have anything to do with the subject at issue here. The metadata records sought identify every user (and, necessarily, every confidential source) the targeted journalists corresponded with on LinkedIn concerning *any* of those stories. *See*

J.A. 292-93. Many of the users identified have no conceivable relationship to the leak investigation. Instead, they are affiliated with media outlets, universities, and law firms which may have been relevant to the host of other stories the targeted journalists were investigating during the same considerable time period. *Id.* at 116-17.

The government also sought and obtained an 18 U.S.C. § 2705(b) order (the "Secrecy Order"). The Secrecy Order prohibited LinkedIn from divulging the existence of the Disclosure Order to the targeted journalists, the News Outlet, or anyone else for one year. *Id.* at 45.

LinkedIn moved to narrow both orders, challenging them as overbroad under both the SCA and the First Amendment. It proposed narrowing the Secrecy Order such that it could inform a single, previously government-vetted lawyer for the News Outlet of the Disclosure Order with the goal of working with the lawyer to identify ways to narrow the Disclosure Order. LinkedIn also requested the *ex parte* materials the government used to obtain the Disclosure and Secrecy Orders.

LinkedIn's motion to modify the orders was heard first by a magistrate judge, who found that LinkedIn had standing to assert its claims but sided with the government on the merits. The magistrate judge's Report and Recommendation ("R&R") interpreted the SCA to allow LinkedIn to bring challenges based only on "logistical or practical burden." *Id.* at 28. It then concluded that the Disclosure Order was not overbroad because such a request for records naturally "will encompass some records unrelated to the crime under investigation." *Id.* at 30. The R&R did not discuss or even acknowledge the possibility that a § 2703(d) order may be overbroad if it seeks substantial irrelevant records. The R&R

doubted that any First Amendment protection applied but noted that even if it did, the Disclosure Order was permissible because "there is no suggestion that this is a fishing expedition." *Id.* at 34-35. Further, the R&R concluded that the Secrecy Order satisfied strict scrutiny because the Order served the government's interest in confidentiality, lasted only a year, and did not infringe on LinkedIn's speech concerning user interests generally. The R&R recommended denying the motion for *ex parte* materials because those materials did not significantly influence its conclusion.

The district court adopted the R&R in full. The court first observed that no "party objected to [the magistrate judge's] conclusion that LinkedIn has standing." *Id.* at 2. On the merits, the court concluded that LinkedIn could not challenge the overbreadth of the orders because it "does not fall within one of the limited grounds in which a responding party may move to quash an order that is entered pursuant to § 2703(d)." *Id.* at 5. Following the reasoning of the magistrate judge, the court declined to weigh the degree of overbreadth, concluding instead that "[t]he fact that some of those . . . records may later be determined to be irrelevant . . . does not alter this Court's conclusion that the Order was validly entered." *Id.* at 6. The district court also concluded that the First Amendment offered no protection because the request likely included at least some relevant records. *Id.* at 7.

The court upheld the Secrecy Order by reasoning that disclosure to anyone would necessarily be less effective in serving the government's general interest in secrecy and LinkedIn's alternative was unlikely to assist in narrowing the Disclosure Order. *Id.* at 12-13. Lastly, the court denied LinkedIn's request for *ex parte* materials because the Due

Process Clause did not require LinkedIn to be given access to the information, especially considering the government's heightened need for secrecy during an ongoing investigation. *Id.* at 13-14.

Thereafter, LinkedIn acquired reason to believe that the government had already made the News Outlet aware of its investigation through other, more public, investigatory avenues. LinkedIn asked the district court to reconsider its ruling on that basis, but the district court refused, finding that "[s]imply because someone knows that an investigation is ongoing does not mean that they are entitled to learn everything about that investigation." *Id.* at 19.

II.

The government has challenged LinkedIn's standing along two lines. First, it argues that LinkedIn lacks the necessary injury in fact to bring any claim. Second, it challenges LinkedIn's ability to assert the First Amendment interests of the targeted journalists and the News Outlet.

The "irreducible constitutional minimum of standing" requires an "injury in fact" "fairly traceable to the challenged action" and likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted). LinkedIn has satisfied each of these elements.

LinkedIn has suffered three kinds of sufficient injury in fact. It is subject to a court order obligating it "to provide documents it would prefer to withhold." *Seila Law LLC v. CFPB*, 591 U.S. 197, 211 (2020). That this creates standing is "beyond dispute." *Id.* The orders may also cause LinkedIn both reputational and financial harm. LinkedIn markets

itself specifically to journalists and offers features which include ostensibly private messaging. Journalists, in turn, use LinkedIn at high rates. If LinkedIn turns over confidential journalist records that on their face have nothing to do with the government's criminal investigation, journalists may curtail or cease their use of LinkedIn's platform. These effects, too, constitute injury in fact. *See Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 78 (2026) ("'[R]eputational harms,' as a general matter, are classic Article III injuries.") (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)); *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 269 (4th Cir. 2025) ("[F]inancial harm is a classic and paradigmatic form of injury in fact.") (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018)). Even if the effects are slight, an "'identifiable trifle' if actual and genuine, gives rise to standing." *Conservation Council of N.C. v. Costanzo*, 505 F.2d 498, 501 (4th Cir. 1974) (quoting *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973)). Harms caused by involuntary disclosure pursuant to a court order are fairly traceable to that order and redressable by quashing it. *See Seila Law*, 591 U.S. at 211.

The government has also challenged LinkedIn's standing to assert First Amendment claims. Such an argument arises from the prudential standing rules which restrict parties from asserting the rights of others. *See Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 804-05 (1985). Unlike the Constitution's requirements, these prudential limits need not be applied where the parties have not "resisted an authoritative constitutional determination" of their claims below. *Craig v. Boren*, 429 U.S. 190, 193 (1976). The government argued in briefing that LinkedIn lacks third-party standing to bring challenges to the Disclosure Order based on the First Amendment interests of the targeted journalists and News Outlet.

Response Br. at 16-19. Yet it raised no such objection in the district court after the Magistrate Judge concluded that the requirements of third-party standing were satisfied. J.A. 2. This point was expressly conceded at oral argument. Sealed Oral Argument at 17:30-17:40. As such, we need not address this argument further.

Still, we are satisfied that the requirements of third-party standing are met here. In addition to the previously discussed injury in fact, third-party standing generally requires that a litigant "have a close relation to the third party" and "some hinderance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991). That the targeted journalists and News Outlet are prevented from asserting their First Amendment interests in this case is obvious. The Secrecy Order keeps them entirely in the dark. Without LinkedIn's intervention, the risk to their First Amendment rights is significant. Moreover, vendors such as LinkedIn "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig*, 429 U.S. at 195. This vendor-vendee relationship would be damaged if journalists curtailed their use of LinkedIn to communicate with confidential sources in the wake of the Disclosure Order.

The government has argued that, notwithstanding the foregoing, LinkedIn lacks a sufficiently close relationship with its users because LinkedIn has "over 1 billion members." Response Br. at 18. That fact is not persuasive. The government has not cited, nor are we aware of, any case which purports to allow only small businesses to assert the claims of their customers. We see no reason to create such a rule here.

III.

We next consider the undisputable weight of the government's interest in this case. It is the government's right and responsibility to investigate possible violations of the law. That interest has a special gravity where a suspected crime involves the compromise of special operations implicating national security. The government's strong national security interest in this case need not be submitted to proof; it is self-evident. Leaks of classified materials can transmit highly sensitive information to our adversaries in areas in which stealth is essential. Such leaks can also place in greater danger the lives of the men and women working in covert operations to protect our country. Judicial negation of the government's interest in matters of the greatest military urgency would also risk violation of the separation of powers, as the Constitution assigns no responsibility for the conduct of warfare or foreign affairs to the courts. In overturning the district court, we do not chide it for the rightful respect it demonstrated to the government's interest in this case. The government is entitled to discovery to the full extent permitted by law. It is entitled to a disclosure order. It is even entitled to a *broad* disclosure order. But it is not entitled to carte blanche.

The government chose to investigate the leak in this case through a specific provision of the SCA, 18 U.S.C. § 2703(d). The statute enables the government to obtain a court order directing providers of internet services to divulge user records under specific circumstances. LinkedIn, in turn, moved to quash or narrow the Disclosure Order. We review motions to quash or modify such orders for abuse of discretion but review the

relevant interpretations of law de novo. *See United States v. Under Seal*, 737 F.3d 330, 332-33 (4th Cir. 2013).

Our analysis begins, as always, with the text. Section § 2703(d) of the SCA provides as follows:

> A court order for disclosure . . . shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the . . . information sought, [is] relevant and material to an ongoing criminal investigation. . . . A court issuing an order pursuant to this section, on a motion made promptly by the service provider, may quash or modify such order, if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider.

The statute gives the government a clear right to obtain records that are "relevant and material" to its investigation. The problem with this seemingly straightforward rule is that no order will ever be perfectly crafted to reach only relevant records and no others. A witness's communications on a particular day may include a plain admission of guilt, a simple breakfast order, and privileged communications with an attorney. A records request can, of course, be narrowed to seek records only for a certain time period, between certain individuals, or (when searching message content) for certain keywords. But that must not slight the recognition that § 2703(d) orders are often used in the early stages of government investigations, which must begin broad and narrow over time. "One simply cannot know in advance whether information sought during the investigation will be relevant and admissible in a prosecution for a particular offense." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 300 (1991).

There is, however, an outer limit to the amount of irrelevant or immaterial records the government may obtain through a § 2703(d) order. Plainly irrelevant or immaterial records encompassed in a § 2703(d) order constitute impermissible overbreadth. While some degree of overbreadth may be inevitable, the SCA and the Constitution require the district court to analyze the degree of overbreadth and trim the more far-fetched reaches of the government's records request.

A.

The court's obligation to analyze overbreadth initially arises from the statutory text, which dictates that an order shall issue "only if" the government presents sufficient proof that the records are "relevant and material." 18 U.S.C. § 2703(d). This obligation is unqualified. There is no express exception for national security. Still, the statute requires only "specific and articulable facts showing that there are reasonable grounds" to find relevance and materiality, rather than some higher standard of proof. *Id.*; *see also In re Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(d)*, 707 F.3d 283, 287 (4th Cir. 2013) ("*Applebaum*") (characterizing this as a "reasonable suspicion" standard). The statutory phraseology invests the district court with a substantial degree of discretion, and it is unlikely that some preordained set of appellate rules can anticipate all future statutory applications.

The district court in its discretion is not forbidden from seeking input from the subject of the request. Because of the technical judgments inherent in crafting orders under the SCA, companies such as LinkedIn, who are familiar with their own services, may be able to provide context and suggestions for how relevant categories of data might be

ascertained. *See* Amicus Br. of Amazon.com, Inc. et al. at 6-7. The district court may not be required to seek this context, but if a prima facie case is made that some portion or category of the requested records bears little, if any, relationship to the investigation, the district court may not dismiss it out of hand. Instead, it should ask the government why it believes that a broad disclosure would be relevant and material. The government must be given every opportunity to explain its reasoning. If the district court is not persuaded, however, it must narrow the order.

It was error for the district court to forgo this analysis and offer blanket approval to the government's broad request. Nevertheless, because LinkedIn has challenged the Disclosure Order as an undue burden, we consider, as well, the grounds for it to do so.

B.

Section 2703 lays out two specific grounds on which a court order might be challenged:

> A court issuing an order pursuant to this section, on a motion made promptly by the service provider, may quash or modify such order, if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider.

18 U.S.C. § 2703(d). LinkedIn has not argued that the requested records are "unusually voluminous." Opening Br. at 30-35. The only dispute is whether an overbroad order creates an "undue burden" on LinkedIn.

As a logical matter, lack of relevance and materiality is itself an "undue burden." While we have noted that these two things are often not evident in the investigation's early stages, we have also made clear that the two criteria are not to be ignored. An overbreadth

challenge argues that the order, in its current form, should never have issued. Any burden imposed by such an order is therefore "undue." *See Undue*, The Random House Dictionary of the English Language (2d ed. 1987) ("Unwarranted; excessive."). Indeed, "undue burden" is regularly construed to include challenges based on overbreadth in other contexts. *See Va. Dept. of Corr. v. Jordan*, 921 F.3d 180, 189-90 (4th Cir. 2019).

Even where records are logistically feasible to compile, harm to users caused by an overbroad Disclosure Order will also harm the targeted company by necessity. An overbroad order turns over irrelevant and immaterial records and undermines privacy without reason. Users expecting to converse in private will be unpleasantly surprised to find the expected reality fall short, which naturally translates to some amount of diminished usage. There may also be second-order effects from negative publicity if the public at large thinks a company will not go to bat for its customers' online privacy. While service providers may not prevail in these challenges, they do have a basis for such fears. As discussed, LinkedIn markets itself to journalists and will feel repercussions if journalists lose confidence in it as a platform.

This broad construction of "undue burden" makes additional sense in light of the concerns underlying the SCA. Congress created the SCA to protect the privacy interests of individuals and it gave providers such as LinkedIn the responsibility to protect those interests. *See, e.g.*, *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 203 (D.D.C. 2018) ("[T]he SCA's statutory scheme bestows upon covered entities greater responsibilities regarding the disclosure and safeguarding of their customers' electronic information. . . ."). Overbreadth challenges help to maintain the

balance between important individual privacy interests and the government's significant interest in disclosure.

C.

The statutory limits of the SCA do not stand in isolation in this case. They are conjoined with, and bolstered by, the dictates of the First Amendment. That the First Amendment is First is no mere irrelevance. The Amendment not only enjoys pride of place. It captures both who we are as a people and what we aspire to become. On top of that, the importance of a free press is explicitly listed right alongside free speech as something not to be legislatively abridged.

When a free press reports on the operations of government, it will often be the case that reporting exposes matters that the government might wish undisclosed, either to save itself from embarrassment or because it simply prefers to have its actions unexamined. This does not confer upon government the right to silence. Since the Founding, "the press has exerted a freedom in canvassing the merits and measures of public men, of every description. . . . On this footing the freedom of the press has stood; on this foundation it yet stands." James Madison, *Report on the Virginia Resolutions*, *in* 4 Elliot's Debates 546, 570 (1836). Press freedom has been eternally hard-fought, its health neither immune from public tempers nor from restriction as an impulse of first resort.

The Disclosure Order would reveal every confidential source the targeted journalists interacted with through LinkedIn during the targeted eighteen-month period. While that order may catch sources relevant to the government's investigation, it will also inevitably sweep in every other confidential source with whom the targeted journalists spoke. The

targeted journalists reported on almost 1,000 stories on a wide range of issues during the relevant period and investigated an unknown number of others never published. Many of those stories appear far removed from the Article that the leak at least partially enabled. The government has no apparent interest in the identities of those confidential sources, but their disclosure could not help but deal a damaging blow to First Amendment freedoms.

Confidentiality of sources is the lifeblood of a free press. Without confidentiality, press coverage would be pushed in the direction of official handouts and outside sources. Without confidentiality, the ability of journalists to report on events of large importance and governmental behavior of dubious legality and integrity could not help but be hampered. Access to sources inside an agency is essential where the press seeks to ensure public accountability from the often-opaque bureaucracies that today define the executive function. Without confidentiality, the ability to speak is infringed. *See Talley v. California*, 362 U.S. 60, 64 (1960). That infringement runs in two directions, limiting both the source and the press in their ability to voice and amplify their views. A request by the government to scoop up reporters' records wholesale and ascertain the identity of their sources would tip the balance against informed discourse in a manner inimical to democratic health.

It is important not to view the value of a free press in isolation. Press freedom is among those things viewed by autocrats worldwide as a threat to their grip on power. Criminal prosecutions freed from partisanship and retribution, a fearless and independent judicial system, and a secure and accessible electoral process all serve to supplement press freedom in distinguishing liberty from oppression. Together these things ensure the human dignity our Constitution intended for Americans.

Newsgathering is therefore certainly "not without its First Amendment protections." *Branzburg v. Hayes,* 408 U.S. 665, 707 (1972). Nevertheless, these protections, important as they are, do have limits. The Supreme Court has been clear that there is "no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation." *Id.* at 708. In the consolidated cases under *Branzburg*, the government sought testimony concerning journalists' confidential sources who committed various drug crimes and other serious offenses. *Id.* at 667-77. The identities of these sources, which the journalists sought to withhold, were therefore unquestionably relevant and material to the government's investigation.

Section 2703(d) orders, by contrast, include some degree of irrelevant material. In such records request cases, this court has applied the test laid out by Justice Powell, the crucial fifth vote in *Branzburg*. *See In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 232 (4th Cir. 1992) ("*Model Magazine*") ("We find that Justice Powell's opinion is the clearest explanation of how *Branzburg* applies to our facts."). In the Justice's words:

> [I]f the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement . . . [t]he asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.

*Branzburg*, 408 U.S. at 710 (Powell, J., concurring). As such, where some portion of the government's request seeks records with only a "remote and tenuous" relationship to the investigation, and especially where that request "implicates confidential source

relationship[s]," the district court must conduct a balancing analysis. *Id.* It must consider the constitutional burden even if it ultimately concludes the request is permissible.

Rather than creating a distinct test, the First Amendment inquiry merges with and strengthens the tailoring requirements in 18 U.S.C. § 2703(d). The two are joined at the hip. When considering a challenge to a grand jury subpoena, this court held that district courts should "apply with special sensitivity . . . the traditional rule that '[g]rand juries are not licensed to engage in arbitrary fishing expeditions. . . .'" *Model Magazine*, 955 F.2d at 234 (quoting *R. Enterprises*, 498 U.S. at 299). So too must the district court here apply with special sensitivity the rules that a § 2703(d) order may only seek "relevant and material" records and may not pose an undue burden. Those limitations are always important, but even more so where, as here, they protect fundamental constitutional freedoms.

* * *

In light of the foregoing principles limned by both the SCA and the First Amendment, we return to the case at hand. We understand what the incentives are for the government to want a thorough investigation of a leak on a matter so self-evidently tied to national security concerns. To a considerable extent, the government is entitled to have its desire respected. But respect does not translate into license to round up indiscriminately the identities of confidential and unrelated newsgathering sources. Our review of this order persuades us that, in its present form, it is substantially overbroad. The district court should have considered all the values in the balance, irrespective of what its ultimate judgment might prove to be.

On remand, the district court's analysis should thus consider the following: (1) the government's need for the Disclosure Order, (2) the breadth of the records sought and whether any subdivisions might feasibly be drawn, (3) that the government cannot know precisely what is relevant at early stages of an investigation, and (4) any First Amendment and SCA standards implicated by the Disclosure Order. We have confidence that the statutory discretion conferred upon the district court will be soundly exercised upon remand.

IV.

We turn next to the Secrecy Order adopted by the district court. A court order under § 2703(d), such as the Disclosure Order, is presumptively public. Here, however, the government sought and obtained a Secrecy Order which forbids LinkedIn from divulging the existence of the orders.

As we have earlier noted, the government's interest in discouraging and investigating leaks that divulge special operations is self-evident. The government need not be put to proof of the obvious. The importance of this compelling interest is not limited to one or another phase of the trial court's inquiry. It is to be duly respected throughout. The SCA permits the government to protect its interest through the use of 18 U.S.C. § 2705(b), which reads:

> A governmental entity acting under section 2703 . . . may apply to a court for an order commanding [the entity] to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order. The court shall enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in—

> **(1)** endangering the life or physical safety of an individual;
> **(2)** flight from prosecution;
> **(3)** destruction of or tampering with evidence;
> **(4)** intimidation of potential witnesses; or
> **(5)** otherwise seriously jeopardizing an investigation or unduly delaying a trial.

Investigations of national security related leaks will frequently satisfy the statutory factors of § 2705. While there is no express exception for "national security" as such within the text of § 2705, leak investigations of this type will often implicate several of the enumerated harms. The clearest example of this is § 2705(b)(5). The government protects national security information by investigating leaks of that information. Such investigations are pointless if they publicize the very information the government is striving to protect. The other enumerated harms could be present as well if, for instance, public knowledge of a leak investigation motivated our adversaries to interfere with evidence or witnesses. *See* 18 U.S.C. §§ 2705(b)(3), (b)(4).

The Secrecy Order adopted by the district court is nevertheless quite broad. For a one-year period, the order forbids LinkedIn from disclosing the existence of the Disclosure Order, the Secrecy Order, or the government's application for either one. J.A. 45. This restriction applies not only to LinkedIn's speech to the targeted journalists or the News Outlet, but to "any other person" at all, with the sole exception of legal counsel. *Id.*

The Secrecy Order is also a prior restraint. The parties agree on this point. *See* Response Br. at 39; Opening Br. at 36. Court orders such as the Secrecy Order "are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993). While some restrictions may "chill" speech, a prior restraint "freezes" it before it can ever begin.

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). As such, prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Id.* "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The government's reliance on *Seattle Times Co v. Rhinehart* to argue otherwise is misplaced. 467 U.S. 20 (1984). *Rhinehart* reviewed a discovery order shielding information to which the opposing party would have no access absent court compulsion. *Id.* at 32. That is a different circumstance with little bearing on the instant case.

To repeat to the point of testing reader patience, the government's national security interest presents courts with a different context than the run-of-the-mill applications of § 2705(b). Yet in light of the First Amendment dangers posed by prior restraints, the weight of the government's interest does not absolve the court of the need to engage with the substance of LinkedIn's proposed alternative. *See New York Times Co. v. United States*, 403 U.S. 713 (1971). In that regard we note the apparent contrast between the sheer breadth of the Secrecy Order in its current form and the narrow exception to total secrecy proposed by LinkedIn. As discussed, the Secrecy Order is a nearly complete restriction on LinkedIn's ability to divulge the existence of the Disclosure Order, the Secrecy Order, or the government's application for either one. This broad prohibition stands in contrast to the narrow modification suggested by LinkedIn. LinkedIn seeks permission to divulge the Disclosure Order to a single attorney for the News Outlet. Opening Br. at 40-41, 43. LinkedIn suggests that input from the News Outlet could assist the court in identifying feasible avenues for narrowing the Disclosure Order. *Id.* at 41. LinkedIn also claims this

specific individual has been judged trustworthy in another similar case. *Id.* at 40-41, 43. The government has never drawn that individual's trustworthiness into question.

Instead, the district court based its reasoning on whether the News Outlet's attorney would likely assist it in narrowing the Disclosure Order. The court observed in conclusory fashion that the attorney would lack full knowledge of the investigation and "may also have an incentive to be underinclusive." J.A. 13. Yet, the First Amendment interests here merit careful consideration, which is appropriately aided by input from interested parties such as the News Outlet. LinkedIn's requested modification would not remove the scope of the Disclosure Order from the district court's hands, but only ensure that the district court has before it the full range of relevant perspectives. Our adversarial system not infrequently asks district courts to discern important context from the filings of imperfectly informed litigants. If the district court cannot do so here, it must explain why.

On remand, the government should be given an opportunity to explain why LinkedIn's narrow disclosure would somehow compromise its investigation. Unless the government's response to LinkedIn's proposal is more persuasive than anything the government has presented thus far, LinkedIn's narrow exception to the breadth of the Secrecy Order must be adopted.

V.

We turn, finally, to LinkedIn's request for access to the *ex parte* materials that the government submitted in seeking the Disclosure and Secrecy Orders. LinkedIn's challenge is essentially a claim that the court's ruling deprived it of procedural due process, which is

reviewed for abuse of discretion. *United States v. Weaver*, 282 F.3d 302, 314 (4th Cir. 2002).

We discern no such abuse. The national security posture of the case rightly demanded the court's respect. It is one thing to speak of narrowing the Secrecy Order to permit LinkedIn to share information given to it voluntarily. It is quite another to turn over *ex parte* records that the government believed would be limited to the court's eyes alone. *See* J.A. 14 ("[T]he substance of the Government's *ex parte* filings could potentially jeopardize [the] investigation."). Under such circumstances, we cannot say that it was an abuse of discretion to accord primary weight to the government's desire to withhold the records. On this point, we affirm the district court.

## VI.

Serious security and speech claims are in tension in this case. There is space under law for both. The case is remanded to the able district judge for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*